**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD., FTX TRADING LTD., COTTONWOOD GROVE LTD., and WEST REALM SHIRES SERVICES INC., | Adv. Pro. No. 24-_____(JTD) |
| Plaintiffs, | |
| -against- | |
| NEIL PATEL, I'M KIND OF A BIG DEAL, LLC, and NEIL PATEL DIGITAL, LLC, | |
| Defendants. | |

## COMPLAINT

Debtors and debtors in possession Alameda Research Ltd. ("Alameda"), FTX Trading Ltd.

("FTX Trading"), Cottonwood Grove Ltd. ("Cottonwood"), and West Realm Shires Services Inc.

(d/b/a FTX.US) ("FTX US") (together, the "Plaintiffs") in the above-captioned chapter 11 cases

(the "Chapter 11 Cases" and each a "Chapter 11 Case") file this complaint against Neil Patel

("Patel"), I'm Kind of a Big Deal, LLC ("Big Deal"), and Neil Patel Digital, LLC (d/b/a NP

---

[1]      The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Digital) ("NP Digital") (together, the "Defendants"), to, among other things, avoid and recover fraudulent transfers and preferential transfers and for damages resulting from Patel's knowing assistance of Samuel Bankman-Fried's breaches of fiduciary duty.  Plaintiffs allege the following based upon personal knowledge and upon their investigation to date, and information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      As detailed in numerous Debtor-initiated adversary proceedings, government indictments, and the criminal trial of Samuel Bankman-Fried, the FTX Insiders[2] orchestrated and implemented a vast fraudulent scheme to profit at the expense of the Debtors in these Chapter 11 Cases and their creditors.  Through this scheme, the FTX Insiders deliberately siphoned billions of dollars of funds deposited by customers for use on FTX Trading's and FTX US's cryptocurrency exchanges—FTX.com and FTX.US—which the FTX Insiders used to finance their lavish lifestyles, woo business prospects and political allies, line their pockets and those of their families and friends, and make reckless investments designed to prop up and advance their stature and notoriety in the crypto community.

2.      The FTX Insiders treated funds deposited by customers on the FTX Exchanges as their own personal piggy bank and treasury, a constant stream of capital to be used to shore up their house of cards from collapse and fund their seemingly insatiable aggrandizement.  The FTX Insiders pursued aggressive marketing campaigns to lure customers into depositing more funds with FTX, and to attract new customers and deposits to the FTX.com and FTX.US exchanges, ensuring an ongoing stream of capital.

---

[2]      The "FTX Insiders" include Samuel Bankman-Fried ("Bankman-Fried"), and a group of insiders, including Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh") and Caroline Ellison ("Ellison").

3.      The FTX Insiders' more splashy promotions—Super Bowl ads, celebrity endorsements, and naming rights to the Miami Heat's arena—have already received substantial attention in filings and the popular press.[3]  In addition to this wide scale "brand marketing," the FTX Insiders also aggressively pursued "performance marketing" (a/k/a retail marketing)[4], which "specifically focused on bringing revenue to the FTX platform" by attracting customer deposits and thereby securing new funds that could be improperly siphoned.

4.      Among other initiatives, the FTX Insiders, including Bankman-Fried engaged Defendant Neil Patel and his companies, Defendants Big Deal and NP Digital, for the ostensible purpose of driving performance marketing for the FTX Group.[5]  As with many dubious engagements at FTX, Patel's engagement grew out of his years'-long pre-existing relationship with a top in-house lawyer at the FTX Group.

5.      In October 2021, Bankman-Fried caused Blockfolio Inc. ("Blockfolio")[6] to hire Patel as Marketing Manager and agreed to compensate him $75,000 per month.  Shortly thereafter,

---

[3]     *See, e.g.*, Steven Zeitchik and Julian Mark, *FTX Investors Sue Samuel Bankman-Fried and Celebrity Endorsers*, The Washington Post (Nov. 16, 2022), *https://www.washingtonpost.com/business/2022/11/16/ftx-class-action-lawsuit/;* Stacy Elliott, FTX Is Spending Big on Marketing Because 'We're Behind on Name Recognition': CEO, Decrypt (Nov. 10, 2021), *https://decrypt.co/85744/ftx-is-spending-big-on-marketing-because-were-behind-on-name-recognition-ceo*).

[4]     Performance marketing is an umbrella term to describe a digital marketing campaign strategy that is data- and results-driven. Advertisers typically pay only when certain outcomes are achieved (e.g., clicks, leads, or sales).  A performance marketing campaign can be implemented using, for example, search engine marketing and optimization, social media, and paid ads.

[5]     The term "FTX Group" means, collectively, the Debtors and all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

[6]     Debtor Blockfolio was acquired by FTX in August 2020 and according to Coindesk, the acquisition of Blockfolio, the "the market's leading mobile news and portfolio tracking app," was seen as a strategic effort by FTX, whose customer base primarily comprised quantitative analysts and professional traders, to expand its reach to a broader retail audience.  *See* Zack Voell, *FTX Exchange's $150M Deal for Mobile-First Blockfolio Is a Retail Trading Play*, Coindesk (Aug. 25,

FTX Insiders caused the FTX Group to engage Defendants Big Deal and NP Digital—entities Patel owns or co-founded and has a substantial financial interest in—ultimately paying them at least *$30.8 million*.  Nearly all of this amount was paid from FTX Group accounts that held commingled funds, *i.e.*, funds that had been deposited by customers of the FTX.com and FTX.US exchanges, as well as corporate funds.

6.     The tens of millions of dollars paid to Patel and his affiliates bore no reasonable relationship to the value of the services provided.  For example, FTX Trading paid *$14.8 million* for Big Deal to spend four months merely *attempting* to find another consultant, which it never actually did.  Defendants also billed the FTX Group for duplicative and exaggerated services for which Defendants received excessive and unreasonable fees untethered to any fair market value.  Indeed, FTX Group employees described Defendants' work as "sooo sloppy" and "terrible performance," and many of Defendants' promised services were never provided at all.  The FTX Group eventually significantly limited and then terminated their marketing agreements with Big Deal and NP Digital by August 2022.  Nevertheless, weeks before the FTX Group's collapse, Patel further abused his insider status to covertly effectuate transfers to the Defendants by submitting invoices on behalf of NP Digital via private slack messages, despite knowing the engagements were a sham and had been effectively terminated.

7.     Plaintiffs bring this adversary proceeding pursuant to Sections 105, 510(c), 544, 548, and 550 of the Bankruptcy Code, Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. Tit. 6, §§ 1304(a)(1)-(2) and 1305, Section 112.180 of the Nevada Revised Statutes, Nev. Rev. Stat. §§ 112.180(2)(a)-(b), and Section 3439.04 of the California Civil Code,

---

2020) https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/.

Cal. Civ. Code §§ 3439.04(a)(1)-(2), to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made, all transfers of property of the Plaintiffs to Defendants made prior to commencement of the Chapter 11 Cases.

8.     Plaintiffs have determined, based on their analysis and investigation to date, that the aforementioned transfers, as detailed in **Exhibit A**, are avoidable under the Bankruptcy Code, Title 6 of the Delaware Code, Section 112.180 of the Nevada Revised Statutes, and Section 3439.04 of the California Civil Code.  In addition, Plaintiffs assert preference claims against NP Digital and Big Deal with respect to certain transfers and withdrawals during the Preference Period, as detailed in **Exhibits B and C**, which are avoidable under Section 547 of the Bankruptcy Code.

9.     Defendant Patel's and NP Digital's serial pattern of inequitable conduct to enrich themselves to the detriment of Debtors' customers and other creditors, particularly in the run up to Debtors' bankruptcy filing, has resulted in an unfair advantage conferred to NP Digital over unsecured and other creditors in the Debtors' chapter 11 cases.  Patel and NP Digital are each a non-statutory insider, as each is "in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's-length" or were at their direction.  The actions of Patel and NP Digital drained the Debtors of assets that should have been available for distribution to creditors at a time when the FTX Group was on the verge of bankruptcy.  Accordingly, Plaintiffs also seek to subordinate any claims that NP Digital has filed or held in these Chapter 11 Cases pursuant to Section 510(c) of the Bankruptcy Code.

10.     Given Patel's and NP Digital's receipt of avoidable transfers (and other egregious and wrongful conduct), Plaintiffs also seek to disallow any and all claims filed or held by the Defendants in these Chapter 11 Cases pursuant to Section 502(d) of the Bankruptcy Code.

11.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs reserve the right to amend their pleading to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee.

## RELEVANT PARTIES

12.     Plaintiff and Debtor Alameda Research Ltd. is incorporated under the laws of the British Virgin Islands and is a wholly owned subsidiary of Alameda Research LLC (together, with Alameda, "Alameda Research"), a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

13.     Plaintiff and Debtor FTX Trading Ltd. is incorporated under the laws of Antigua and Barbuda.  FTX Trading is approximately 80% owned by Paper Bird Inc., a Delaware corporation that is wholly owned by Bankman-Fried,[7] who served as its CEO, Chief Financial Officer, President, and Secretary, beginning on September 19, 2021.  The remaining approximately 20% of FTX Trading is owned by hundreds of minority shareholders, including FTX Group employees and various investment funds.

14.     Plaintiff  and Debtor West Realm Shires Services, Inc. (d/b/a FTX.US)  is a Delaware corporation.  It is a wholly owned subsidiary of West Realm Shires, Inc. ("WRS"), which is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.  It began operations in or around January 2020.

---

[7]     Wang holds an unexercised warrant, issued November 10, 2019, to purchase 249 shares of common stock (24.9%) of Paper Bird Inc.

15.    Plaintiff and Debtor Cottonwood Grove Ltd. is a Hong Kong company and a wholly owned subsidiary of Alameda.  Cottonwood Grove entered into various intercompany agreements with FTX Trading and Alameda, including consulting and subcontracting agreements with Alameda to develop and license the software for FTX.com, as well as a licensing agreement granting FTX Trading the right to operate FTX.com in exchange for royalty payments.

16.    Defendant Neil Patel describes himself as a *New York Times* bestselling author, a "top influencer" according to the *Wall Street Journal*, and "one of the top 10 marketers" by *Forbes*.[8]  Patel co-founded, along with Michael Kamo, Defendant NP Digital, and holds himself out as NP Digital's Chief Marketing Officer and owner of Defendant Big Deal.  Patel was the FTX Group's Marketing Manager beginning in October 2021 and retained access to his employee credentials, and continued to communicate with FTX executives, until the FTX Group's collapse in November 2022.  He is a resident of California and Nevada.

17.    Defendant I'm Kind of a Big Deal, LLC is a limited liability company incorporated in Nevada on January 6, 2015.  Patel is the owner of Big Deal and its only registered officer.

18.    Defendant Neil Patel Digital, LLC (d/b/a NP Digital) is a limited liability company incorporated in Nevada on January 25, 2021.  Corporate filings in the State of Nevada identify Patel as a registered officer.

19.    Non-party Samuel Bankman-Fried ("Bankman-Fried") is a co-founder of FTX Trading, FTX US, Alameda, and Cottonwood, and at all relevant times controlled Plaintiffs through his majority ownership stakes in their ultimate parent companies.

---

[8]    https://neilpatel.com/.

## JURISDICTION AND VENUE

20.     On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022. Chapter 11 Cases, D.I. 128. On October 8, 2024, the Court entered an order confirming The Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates. Chapter 11 Cases, D.I. 26404.

21.     Following entry of that order, and until the Plan's effective date, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code and Plaintiff has the authority to commence, and thereafter to prosecute, this is a proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Debtors' chapter 11 estates. Fed. R. Bankr. P. 7001(1).

22.     This adversary proceeding relates to the Chapter 11 Cases and the Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

23.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it relates to the Chapter 11 Cases brought under title 11 of the Bankruptcy Code.

24.     Counts I through IX are core proceedings which may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  Count X is a non-core proceeding, but is related to the Chapter 11 Cases.

25.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs confirm their consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

26.     The statutory predicates for the relief requested herein are Sections 502(d), 510(c), 544, 547, 548, 550, and 105 of the Bankruptcy Code, Sections 1304 and 1305 of Title 6 of the Delaware Code, Section 112.180 of the Nevada Revised Statutes, and Section 3439.04 of the California Civil Code.

27.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

## FACTUAL ALLEGATIONS

### I.     THE FTX GROUP'S FOUNDING AND THE FTX INSIDERS' MISCONDUCT

28.     The formation and eventual collapse of the FTX Group has been fully detailed in various indictments, the trial of Samuel Bankman-Fried, and prior pleadings in the Chapter 11 Cases.[9]

---

[9]     *See, e.g.*, First Day Declaration of John J. Ray III (filed Nov. 17, 2022) [D.I. 24] ("First Day Declaration") and Third Superseding Indictment, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Aug. 14, 2022), ECF No. 202.

29.     In 2019, Bankman-Fried and Wang created FTX.com, an international cryptocurrency exchange.  FTX.com quickly became one of the largest digital asset exchanges in the world.  Following the initial success of FTX.com, in January 2020, Bankman-Fried founded FTX US, which hosted FTX.US (together with FTX.com, the "Exchanges"), a digital asset exchange for U.S.-based customers.

30.     The Exchanges were highly successful in attracting customers and their cash and cryptocurrency.  By 2021, the Exchanges claimed to hold approximately $15 billion in assets on their platforms and to transact $16 billion in daily trading volume.  As of January 2022, FTX.com was valued at $32 billion, and FTX.US at $8 billion.

31.     From the start of FTX.com's operations in or around April 2019 through at least 2021, FTX.com customers were directed to deposit fiat currency (*e.g.*, U.S. Dollars) into bank accounts controlled by Alameda.  Billions of dollars of FTX.com funds deposited by customers were deposited directly into Alameda-controlled bank accounts or were later re-directed into Alameda-controlled bank accounts.  FTX Trading did not segregate these funds deposited by customers but instead, at the FTX Insiders' direction, commingled them with FTX Trading's own assets and with Alameda's assets.

32.     Using misleading accounts, "special privileges", "back-doors", and an opaque network of bank accounts, the FTX Insiders indiscriminately looted the Exchanges of billions of dollars of customer deposits.  FTX Insiders used these funds to finance their recklessly speculative and unhedged trading operations, purported "venture" investments, real estate purchases, personal "loans," charitable and political contributions, and all manner of other transfers.  This scheme was designed by the FTX Insiders to benefit themselves by enhancing their lifestyles, ingratiating themselves with business prospects and potential allies, and lining their own and their families'

and friends' pockets.  In doing so, the FTX Insiders defrauded the FTX Group's customers, creditors, and shareholders, and violated their fiduciary duties and numerous laws.

## II.    PATEL'S ROLE IN THE FTX INSIDERS' AGGRESSIVE MARKETING PUSH

33.    From the beginning, the FTX Insiders recognized that they would need a constant stream of customer deposits to perpetrate their fraudulent scheme and prevent their house of cards from collapsing.  To that end, they pursued aggressive marketing campaigns to attract new customers and deposits to the FTX.com and FTX.US exchanges.  Part of this strategy involved pursuing "performance marketing" (a/k/a retail marketing), which "specifically focused on bringing revenue to the FTX platform" by attracting customer deposits.

34.    The FTX Insiders were interested in performance marketing as early as June 2020. For example, on June 8, 2020, Bankman-Fried wrote: "I don't know how to do retail marketing! This post is an exercise in *pretending* that I do … Right now we mostly advertise to crypto traders, but a lot of what we offer is really revolutionary outside of the space.  Instant deposits/withdrawals?  5 minutes to create an account and start trading?  100x leverage? . . . Ads/SEO—who wants to own this?"

35.    The FTX Insiders began pursuing performance marketing in earnest by April 2021. As a senior Blockfolio employee wrote in an internal document around that time: "Paid and performance marketing are going to be a pillar of our FTX marketing across brands. . . Given the speed at which FTX moves, it makes sense to hire or acquire that specialized expertise so we can go from 0-60 in this area."

36.    About six months later, on or about October 2, 2021, an FTX Group in-house lawyer introduced Neil Patel to Bankman-Fried.  According to Patel, he had "known [the FTX

lawyer] for years," dating back to when he had been Patel's attorney.  The FTX Insiders enlisted Patel a few weeks after this introduction.

37.    On October 18, 2021, Patel accepted a position as Marketing Manager for Blockfolio with a "$75k per month salary" and 100,000 shares of FTX Trading Class A common stock.  Despite being an employee, Patel also signed a separate consulting agreement to provide services to Cottonwood and FTX US in exchange for options to purchase two million Serum tokens[10] ("SRM") at a strike price of $0.75, and 5,000 shares of FTX US Class A common stock at a price to be established by the FTX US board after receipt of the applicable valuation.

38.    Bankman-Fried immediately gave Patel a significant role within the FTX Group. Internal documents prepared by FTX Group employees describe Patel as "our CMO [Chief Marketing Officer] globally" and "primary consultant" who worked on "performance marketing, A/B testing, data integration and overall marketing strategy."  Patel signed at least 51 sponsorship contracts on behalf of FTX US, amounting to over $2,681,000 in sponsorship fees; approved budgets for advertisement spends; and was involved in the interviewing and hiring process for the marketing team and setting salaries.  FTX Group senior managers, executives, and officers often deferred to Patel's judgment on major decisions.  For example, on November 18, 2021, Patel requested approval from Ryan Salame, then CEO of FTX Digital Markets, for an additional $6,246,090.09 that NP Digital could spend on advertisements for FTX Trading.  Salame approved the budget and noted, "I'm hyper confident you know what you're doing."

---

[10]    The SRM (Serum) token is a digital currency minted by the Serum Foundation, a purportedly decentralized finance exchange created by the FTX Insiders in July 2020.  After setting up the Serum Foundation and minting 10 billion SRM tokens, the FTX Insiders decided that the FTX Insiders, FTX Group employees, and FTX Group entities would purchase or receive as grants billions of SRM tokens.

### III.    FTX INSIDERS AND PATEL CAUSED PLAINTIFFS TO TRANSFER MILLIONS TO DEFENDANTS BIG DEAL AND NP DIGITAL

39.    Patel's introduction to Bankman-Fried was extremely lucrative for him and his companies.  Not long after Bankman-Fried entrusted Patel with managing the FTX Group's marketing strategy, FTX Trading and Cottonwood entered into media and marketing agreements with Big Deal and NP Digital – both companies that Patel controlled.  These agreements were not negotiated at arm's length and were designed to enrich Defendants at Plaintiffs' expense.  Plaintiffs paid Defendants over *$30.8 million* for duplicative, sub-par, and often non-existent services.

40.    Patel himself foreshadowed the snake oil he was selling.  In describing how companies should select a digital marketing agency, Patel remarked:

> The first thing you must understand is that there are many charlatans in the digital marketing world who try to sell 'snake oil' to their customers. I personally know a few marketing agencies that promise clients the world, then provide lackluster results and keep asking for more money, saying that it takes a lot of time to see significant improvements in organic traffic.[11]

As detailed below, Patel described his *modus operandi* perfectly.

### A.    The Big Deal Agreement

41.    On January 3, 2022, Patel sent Plaintiffs draft agreements between FTX Trading and Big Deal, using Patel's personal email account.  Plaintiffs have been unable to identify any prior existing communications concerning the agreements.  The agreements were executed just two days later, on January 5, 2022, effective January 1, 2022.  The agreements—a Master Services Agreement and Statement of Work (collectively, the "Big Deal Agreement")—describe Big Deal's

---

[11]    Neil Patel, *How to Select the Best Digital Marketing Agency*, Huffpost The Blog (May 25, 2016) https://www.huffpost.com/entry/how-to-select-the-best-di_b_10015646.

responsibility in just two vague lines: "Over the course of the Agreement, Big Deal will find a 3rd party consultant and work with them to either become an affiliate or find ways to promote FTX."

42.     The same day the Big Deal Agreement was executed, Patel e-mailed an invoice for $14.8 million to an FTX Group lawyer.  The invoice described the services warranting this enormous payment in just one word: "Marketing."  Three minutes later, the FTX Group lawyer sent the executed Big Deal Agreement and invoice to a private Slack channel with Bankman-Fried and the former FTX Trading Chief Financial Officer ("CFO"), with the following message:

> "Neil is helping us improve reputation management through a third party.  Could you pay this on behalf of [FTX Trading]?  ***This is not Neil's compensation.  Let's not post this to public channel please.***"

43.     (Emphasis added).  Bankman-Fried and FTX Trading's former CFO acknowledged the message.  However, despite this characterization, this invoice *was* compensation for Patel, by way of Patel's thinly veiled limited liability curtain.  On January 10, 2022, Big Deal received a wire transfer of $14.8 million from an FTX Trading account, which contained commingled funds deposited by customers.

44.     The upshot of these machinations was that FTX Trading paid $14.8 million to Big Deal in return for nothing more than Big Deal's agreement to try to find another consultant.  And if this were not absurd enough, Big Deal never actually identified the consultant.  The Big Deal Agreement conferred no benefit on FTX Trading, was an egregious waste of corporate assets, and appears to have been nothing other than a mechanism to enrich an FTX insider, Patel, who was already on the FTX Group's payroll.

### B.     The FTX Media Agreements

45.     Shortly after Patel became an FTX Group employee, on October 22, 2021, FTX Trading and Defendant NP Digital executed a Master Services Agreement (the "FTX Media

MSA"), effective October 19, 2021.  Bankman-Fried signed for FTX Trading and Traci Rice, Vice

President of Operations, signed on behalf of NP Digital.

46.     Under the FTX Media MSA, NP Digital was engaged for a term of three years to

render services to FTX Trading as further outlined in two Statements of Work ("SOWs"):[12]

- **Earned Media SOW**.  NP Digital agreed to provide 74 categories of services, each of which contained several promised deliverables, to increase organic website traffic and conversions for FTX.com and FTX.US using Search Engine Optimization ("SEO") techniques.[13]  In exchange, FTX Trading was required to pay NP Digital a one-time set-up fee of $1 million and an annual management fee of $6 million.

- **Paid Media SOW**.  NP Digital agreed to provide services for online marketing through paid media channels[14] for FTX.com, Blockfolio.com, and FTX.US.  The SOW identified 16 categories of services to be provided, often with several deliverables for each category.  In return, NP Digital was to receive 4% to 11 % of the monthly media spend as management fees and would pass through ad-serving or technology fees to FTX Trading.

47.     As with the Big Deal Agreement, the FTX Media Agreements were not negotiated

at arm's length and set completely arbitrary fees.  By way of example, on October 6, 2021, Patel

sent an FTX Group lawyer drafts of the FTX Media Agreements, indicating that they contained

the annual fee as contemplated and the $3 million "[they] discussed."  Tellingly, Patel noted that

he had "added [the $3 million] in as a 'setup' fee."  The final executed Earned Media SOW is

virtually identical to Patel's draft, except that the "set up fee" had been reduced from $3 million

to $1 million with no explanation.  Both Patel's email and the unexplained two-thirds reduction

---

[12]     The FTX Media MSA and the two related SOWs are referred to collectively herein as the "FTX Media Agreements."

[13]     Search Engine Optimization ("SEO") refers to the process of increasing a website's visibility by ensuring that the site appears high on the list of results returned by a search engine, such as Google or Bing.

[14]     Paid Media refers to a type of marketing effort using paid placement to promote a particular brand on a website or social media channel, such as banners, promotions, or other sponsored advertisements.

confirm that the "setup" fee was simply an arbitrary transfer of wealth, completely untethered to any true set-up cost NP Digital incurred.

48.     Patel himself noted the Agreements were "a weird original deal . . . sam and [the FTX] (lawyer) wanted the works. . . and they didn't want to waste time going into scope etc, they just wanted flexibility."  NP Digital employees similarly recognized that "the terms of the [Earned Media SOW] contract were done by Neil [Patel] alone and our directive from him was to execute against the scope."

49.     FTX Insiders, Patel, and NP Digital also intentionally concealed the FTX Media Agreements and the Earned Media SOW fee payments from other FTX Group employees.  Indeed, the Earned Media SOW was described as the "*secret* yearly[] contract done between [an FTX Group lawyer], Neil and Sam."  On October 26, 2021, shortly after the Agreements were executed, FTX Trading's former CFO thanked an FTX US employee for posting NP Digital's invoice in a private Slack channel entitled, "wires-expense-payments-private," instead of the public expense channel.  And when NP Digital shared the Earned Media SOW with the former Global Marketing Director for FTX US upon his request, the document was modified to delete the "Pricing and Payment Terms" section.

50.     FTX Insiders and Patel likely wished to hide the FTX Media Agreements because of the exorbitant, above-market fees to be paid to NP Digital.  According to invoices NP Digital submitted in connection with opening an FTX.US account in Fall 2022, NP Digital charged other businesses $200,000 to $500,000 annually for similar services—*12 times less than it was charging FTX Trading*.

51.     One might have expected that NP Digital would provide above-market work for exorbitant above-market fees.  Not so.  FTX Group employees began voicing dissatisfaction with

NP Digital's work only months into the engagement.   Blockfolio's Director of Marketing complained that "[n]one of the engagement posts are good," while another FTX Group employee observed that "basic elements of writing such as sentence structure, grammar or spelling were not met."   FTX US's Associate General Counsel internally noted that, when reviewing NP Digital drafts of customer newsletters, her comments went beyond just legal review into basic writing feedback and that she got "used to doing that with NPD because they were sooo sloppy."

52.      Because of NP Digital's "terrible performance," FTX Trading terminated the Paid Media SOW in June 2022, just nine months into the three-year contract, and took the paid social media campaigns in-house.

53.      At around the same time, FTX Trading's former Chief Operating Officer reported to other FTX Group employees that Patel had "offered to work on [the Earned Media SOW] internally to improve [NP Digital's] service quality," and was going to "take a look at the contract and help on the termination."   Patel was informed that "the goal [wa]s to completely terminate [the FTX Media Agreements]," including the Earned Media SOW, if NP Digital's performance did not improve.   On July 11, 2022, Patel assured the former FTX US Global Marketing Director that he was trying to work out the issues and that he was "not trying to hold Ftx captive or anything."

54.      Yet, there was no improvement in NP Digital's performance under the remaining Earned Media SOW.   In fact, NP Digital appears to have performed few, if any, services under the Earned Media SOW after June 2022.   The Earned Media SOW details deliverables primarily relating to "App Store Optimization" and "Content Creation."   Yet, in August 2022, NP Digital employees informed Patel that they had not received "approval to post new content to FTX.US since June 2022"; that "FTX has removed our App Store access"; and that written approval from FTX management was required for website and app updates.   NP Digital never received any

written approval, and on information and belief, never provided any of the contracted-for deliverables, from June 2022 up until the Petition Date.

55.     Given that NP Digital was providing few, if any, of the contracted-for services, its fees should have been correspondingly reduced.  Yet, contrary to his representation that he was "not trying to hold [FTX Trading] captive or anything," Patel proceeded to do exactly that.  On October 21, 2022, less than a month before the Petition Date, Patel sent a private message to FTX Trading's former CFO, seeking the full $6 million Annual Management Fee for year two of the Earned Media SOW.  Four days later, on October 25, 2022, during the Preference Period, NP Digital received a transfer of $6 million from an FTX Trading account holding commingled funds deposited by customers.

56.     In total, the FTX Insiders and Patel funneled over $17 million to NP Digital under the FTX Media Agreements, the entirety of which came directly from FTX Trading accounts containing commingled funds deposited by customers.  FTX Trading received no value, or no reasonable value, in return.  These transactions, which are reflected in **Exhibit A**, are avoidable.

### C.     The Serum Agreements

57.     Just days after executing the Big Deal Agreement, on January 13, 2022, Patel sent Plaintiffs draft agreements for "the 2 projects we talked about over the weekend.  FTT and SRM." Soon thereafter, NP Digital executed two agreements (the "Serum Agreements"): one with Plaintiff and Debtor Cottonwood (the "Cottonwood-NP Digital Agreement"), and the other with non-Debtor Incentive Ecosystem Foundation ("IEF"; the "IEF-NP Digital Agreement").  IEF was under the de facto control of FTX Insiders and was set up on or around December 3, 2020, to provide incentives to promote the SRM token, including marketing, innovation, and development.

58.     Each Serum Agreement provides that NP Digital would increase organic website traffic and conversions to projectserum.com using Search Engine Optimization techniques.  In exchange, Cottonwood and IEF would each pay NP Digital an annual management fee of $1.8 million in equal monthly installments of $150,000.  Despite being paid at least $2.7 million, Plaintiffs have been unable to identify any deliverables provided by NP Digital under the Serum Agreements.

59.     Upon information and belief, and as outlined in **Exhibit A**, the $2.7 million was paid to NP Digital by Alameda, FTX Trading, and FTX US.  Although NP Digital received transfers totaling $600,000 from Cottonwood accounts under the Cottonwood-NP Digital Agreement, Plaintiffs have traced the original source of these funds to Alameda.[15]  The remaining $2.1 million paid to NP Digital came from Plaintiffs' accounts that contained commingled funds deposited by customers.

60.     Even though IEF was contractually responsible to pay fees under the IEF-NP Digital Agreement, it appears such fees were in fact paid by Alameda and FTX US.  For example, on October 14, 2022, Patel sent a Slack message to FTX Trading's former CFO that he "[w]anted to check to see if you got my message on signal . . . It's all setup with the account [on the FTX.US exchange] under mike@neilpatel.com."  Two days later, Patel made two withdrawals from this FTX.US exchange account for a total of $300,000.  These payments correspond to monthly installments owed under both Serum Agreements.

---

[15]     Cottonwood's primary source of funds came from 12 payments from Alameda Research LLC and North Dimension Inc. accounts.

## IV.    THE TRANSFERS TO DEFENDANTS INVOLVED MULTIPLE BADGES OF FRAUD, EVIDENCING ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS

61.    As set forth above, multiple badges of fraud recognized by bankruptcy law, and applicable non-bankruptcy law, including Del. Code Ann. tit. 6, § 1304(b), Nev. Rev. Stat. § 112.180(b), and Cal. Civ. Code § 3439.04(b), permeate the transfers to the Defendants, including that:

(a)    The transfers arose out of a close relationship between insiders, including Bankman-Fried, and insider transferees Neil Patel, Big Deal and NP Digital. NP Digital and Big Deal, which are ultimately owned and/or controlled by Patel, received the transfers while Patel was also Blockfolio's Marketing Manager, and described internally as the FTX Group's "Chief Marketing Officer."  In this role, Patel signed at least 51 sponsorship deals on behalf of the FTX Group, amounting to over $2.6 million in sponsorship fees; approved budgets for advertisement spends; and was involved in the interviewing and hiring process for the marketing team and setting salaries;

(b)    The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders by expanding and concealing their fraudulent scheme, thus enabling them to continue misappropriating assets of the FTX Group, including by overpaying their close associates whom they perceived to have media and marketing expertise necessary to acquire new customer enrollments, like Patel and his entities. Insiders orchestrated multiple contracts with Patel's companies, NP Digital and Big Deal, which were duplicative and often provided no distinct or new services.  For example, FTX Group paid Big Deal $14.8 million to find an external consultant— a task it never completed—while NP Digital, also controlled by Patel, received a simultaneous engagement to conduct duplicative marketing services under the FTX Media Agreement and Serum Agreements;

(c)    Numerous material facts relating to the transfers were concealed, including certain invoices issued pursuant to the Big Deal Agreement, FTX Media Agreements, and Serum Agreements, and the source of funds used to pay Big Deal and NP Digital. To conceal the nature and extent of payments made to Patel's companies, insiders routed payment requests privately, often via Slack, outside of public or internal financial channels, and at Patel's request;

(d)    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred.  The Big Deal Agreement, FTX Media Agreements, and Serum Agreements were not made in the regular course of business as is evidenced by the fact that each of these Agreements were entered into without meaningful negotiation.  Additionally, the fees contemplated in the Big Deal Agreement, FTX Media Agreements, and Serum

Agreements grossly exceeded any fair or market-based value for services provided. For instance, NP Digital charged FTX Trading more than 12 times its usual fees for similar clients—$6 million per year, instead of the $200,000 to $500,000 charged elsewhere—for SEO services that, per FTX Group employees, were often unfulfilled or subpar;

(e)   Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

(f)   The transfers occurred shortly before or shortly after the Plaintiffs incurred substantial debts.

## V.   THE PLAINTIFFS WERE INSOLVENT AT ALL RELEVANT TIMES

62.   Plaintiffs were insolvent at all relevant times.  As alleged in the superseding indictment of Bankman-Fried, the FTX empire was built on a house of cards.  "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . ."[16]

63.   The FTX Insiders failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.  The FTX Insiders concealed the FTX Group's failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and other assets deposited by customers.  The FTX Insiders and FTX Group senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the FTX Group's capital structure, and, ultimately, out of the FTX Group's custody.  As alleged in the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed"

---

[16]   *See* First Superseding Indictment ¶ 1, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection."[17]

64.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda Research.  At the same time, although the FTX Group's exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda Research to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

65.    Through these cheats, Alameda Research was not only able to evade collateralizing its position on the exchange; it also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As of the commencement of the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda Research's "line of credit" to *$65 billion*.  Alameda Research lacked the ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments, including the $30,499,999.95 transferred to Defendants.

66.    FTX Insiders' insatiable need for funds was not limited to propping up Alameda Research in the face of extreme risk and management failures.  Bankman-Fried and other FTX Insiders needed funds to pay for billions of dollars in ill-conceived and outright fraudulent transfers. The FTX Group's improper outflows and expenditures are staggering.  Billions of dollars

---

[17]    *Id*. ¶ 4.

were wasted on overpriced assets and investments that were worth only a fraction of the amounts invested.  Billions of dollars were also spent on purported "loans," gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, political contributions, and, as alleged in this complaint, purported service providers who provided little to no significant value to the FTX Group.  This rendered the Plaintiffs insolvent at all relevant times, including when the subject transfers were made between October 28, 2021, and October 25, 2022, as more specifically described in **Exhibits A-C**.

67.     In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John J. Ray III.

68.     On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

69.     The FTX Insiders' conduct has been the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and investigations by a host of regulators. Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the FTX Group.  FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.

70.     On December 19, 2022, Wang pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.  In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda Research "special privileges on the FTX platform," including to allow Alameda Research unfettered use of assets on the

FTX.com exchange, even while Alameda Research maintained negative balances in its own holdings of fiat (*i.e.,* government-issued) currencies and cryptocurrencies.[18]  Using these "special privileges," the FTX Insiders frequently caused Alameda Research to misappropriate funds from the FTX.com exchange for their own benefit.

71.    Also on December 19, 2022, Ellison pleaded guilty to two counts of wire fraud and aiding and abetting the same, two counts of conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.[19]

72.    The SEC charged Wang and Ellison in a parallel proceeding, alleging, among other things, that they manipulated the price of FTT, an FTX.com-issued exchange crypto security token.[20]  Ellison and Wang entered into consent orders with the CFTC as to their liability for engaging in fraud in violation of Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1.[21]

73.    On February 28, 2023, Singh pleaded guilty to wire fraud and aiding and abetting the same, and five conspiracy charges, including conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to violate federal campaign finance laws.[22]

---

[18]    Wang Plea Agreement (Information & Waiver of Indictment) and Plea Tr. 24:6-10, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7, 21.

[19]    Ellison Plea Agreement (Information & Waiver of Indictment), *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9.

[20]    *Securities and Exchange Commission v. Ellison and Wang*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022).

[21]    *CFTC*, Press Release Caroline Ellison and Gary Wang Acknowledge Liability (Dec. 21, 2022), https://www.cftc.gov/PressRoom/PressReleases/8644-22.

[22]    Singh Plea Agreement (Superseding Information & Waiver of Indictment), *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91.

74.    On September 7, 2023, Salame pleaded guilty to conspiracy to make unlawful political contributions and defraud the Federal Election Commission and conspiracy to operate an unlicensed money transmitting business.[23]

75.    On December 9, 2022, the U.S. Attorney's Office for the Southern District of New York indicted Bankman-Fried, charging him with two counts of wire fraud, as well as four counts of conspiracy to commit wire fraud, securities, and commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.[24]  As alleged in a Third Superseding Indictment, filed on August 14, 2023, Bankman-Fried conspired to and actually did commit wire fraud, and conspired to commit securities fraud, commodities fraud, and money laundering.[25]  On November 2, 2023, after approximately three hours of deliberation, the jury in the criminal case found Bankman-Fried guilty on all seven counts of fraud, conspiracy, and money laundering.[26]  Bankman-Fried was sentenced to 25 years in prison on March 28, 2024.

76.    Without accounting for distorting effects of Bankman-Fried and the FTX Insiders' staggering fraud, at all relevant times the FTX Group's liabilities far exceeded the fair value of its assets and the FTX Group lacked sufficient cash, cryptocurrency, and other assets to cover

---

[23]    Salame Plea Agreement (Superseding Information & Waiver of Indictment), *United States v. Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF Nos. 262, 265.

[24]    *See* Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.  The Government withdrew its charge of conspiracy to defraud the United States and violate campaign finance laws.

[25]    *See* Third Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Aug. 14, 2023), ECF No. 202.

[26]    Trial Tr. 3252:3–3254:24; *see, e.g.,* MacKenzie Sigalos, *Sam Bankman-Fried Found Guilty on All Seven Criminal Fraud Counts*, CNBC (Nov. 3, 2023), https://www.cnbc.com/2023/11/02/sam-bankman-fried-found-guilty-on-all-seven-criminal-fraud-counts.html.

customer accounts and their creditors' claims, leaving it inadequately capitalized and with an inability to pay its debts as they came due.  This was an insolvency further deepened by the additional civil and criminal liabilities imposed on the FTX Group, by Bankman-Fried, and the FTX Insiders' fraudulent conduct.

77.     More specifically, Alameda's liabilities were enormous, and from at least early 2022 until the Petition Date, their value far exceeded the value of Alameda's assets.  As detailed herein, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators and individuals working at their behest to modify the exchange software to permit Alameda to maintain a negative balance in its account on the FTX exchange.  This gave Alameda a virtually unlimited "line of credit" to borrow customer deposits on the exchange.  By the first quarter of 2022, Alameda had abused this borrowing power to extract immense resources from customers, and owed substantial sums to other FTX Group entities and various third parties from which it had taken loans.

78.     By contrast, by the first quarter of 2022, Alameda's assets were smaller and overconcentrated in speculative crypto assets and strategies.  In some instances, it was unclear whether Alameda's crypto assets could be liquidated for value.  For example, Alameda was heavily invested in SRM tokens.  Almost all of the SRM tokens in circulation, however, were held by Bankman-Fried and other FTX Insiders.  Consequently, any large market-based sale of SRM tokens would have resulted in their market price falling substantially.

79.     In addition to being balance sheet insolvent, Alameda was also inadequately capitalized.  Given the nature of its business and balance sheet, Alameda required a large capital cushion in order to ensure that it could make loan repayments and meet margin and collateral calls if asset values were to drop.  In particular, Alameda owed substantial crypto assets to third parties

on loan contracts, some of which were "open term" and could be called on demand, and others of which had variable collateral requirements. Alameda had nowhere near sufficient capital to reasonably protect against such risks.

80. FTX Trading was also insolvent at all relevant times, including from the fourth quarter of 2021 onwards. FTX Trading owed customers on the FTX.com exchange more than the digital assets it had to pay those customers. The assets FTX Trading owned were mismatched as compared to its customer liabilities, in large part because of transfers from FTX Trading to Alameda. For instance, FTX.com owed customers far more in fiat and stablecoins than FTX Trading owned in fiat and stablecoins. Furthermore, FTX Trading had large obligations to other entities within the FTX Group, in amounts far exceeding its collectible assets.

81. In addition to being balance sheet insolvent, FTX Trading was also inadequately capitalized. Given the nature of its business and balance sheet, FTX Trading required a large capital cushion in order to ensure that it could satisfy its business obligations, including customer withdrawals and obligations to other entities in the FTX Group. FTX Trading had nowhere near sufficient capital to reasonably protect against such risks.

82. Like Alameda and FTX Trading, FTX US and Cottonwood Grove were also insolvent during the second half of 2022. FTX US owed customers on the FTX.US exchange and other entities in the FTX Group more than it actually held in collectible assets. FTX US was also inadequately capitalized, and therefore it was constantly at risk of being unable to satisfy customer withdrawals, especially in light of the volatile nature of cryptocurrency assets. Cottonwood Grove owed other entities in the FTX Group more than it actually held in collectible assets, rendering it insolvent on a balance sheet and adequacy of capital basis.

## CAUSES OF ACTION

### COUNT I
### FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANTS BIG DEAL AND NP DIGITAL)

83.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 82 as if fully set forth herein.

84.      Plaintiffs made the transfers and incurred the obligations addressed herein between October 28, 2021, and October 25, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants Big Deal and NP Digital was a transfer of property of the Plaintiffs, and each obligation to Big Deal and NP Digital was incurred by Plaintiffs.

85.     Those transfers were made to Big Deal and NP Digital for, and in connection with, Big Deal's, NP Digital's, Patel's and the other FTX Insiders' misconduct as alleged herein.  Thus, each of these transfers was made with the intent to hinder, delay, or defraud present or future creditors.

86.     Multiple badges of fraud recognized by bankruptcy law, Del. Code Ann. tit. 6, § 1304(b), Nev. Rev. Stat. § 112.180(2), and Cal. Civ. Code § 3439.04(b), permeate the aforementioned transfers to Big Deal and NP Digital, as alleged above in paragraph 61.

87.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Defendants Big Deal and NP Digital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT II
## FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
## (AGAINST DEFENDANTS BIG DEAL AND NP DIGITAL)

88.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

89.     Plaintiffs made the transfers and incurred the obligations addressed herein between October 28, 2021, and October 25, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants Big Deal and NP Digital was a transfer of property of the Plaintiffs, and each obligation to Big Deal and NP Digital was incurred by Plaintiffs.

90.     As described in detail above, Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers and each of the Plaintiffs: (a) was insolvent on the date that each transfer was made; (b) became insolvent as a result of these transfers; (c) was engaged in a business or a transaction for which any property remaining with the Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

91.     Accordingly, each of these transfers made by Plaintiffs to Defendants Big Deal and NP Digital should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Big Deal and NP Digital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

## COUNT III
## FRAUDULENT TRANSFERS PURSUANT TO
## 11 U.S.C. § 544(b), AND APPLICABLE LAW INCLUDING DEL. CODE ANN. TIT. 6, § 1304(a)(1), NEV. REV. STAT. § 112.180(1)(a), AND CAL. CIV. CODE § 3439.04(a)(1)
## (AGAINST DEFENDANTS BIG DEAL AND NP DIGITAL)

92.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 91 as if fully set forth herein.

93.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable laws, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq.*, Nev. Rev. Stat. § 112.140 *et seq.*, and Cal. Civ. Code § 3439 *et seq.*

94.    Plaintiffs made the transfers and incurred the obligations addressed herein between October 28, 2021, and October 25, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants Big Deal and NP Digital was a transfer of property of the Plaintiffs, and each obligation to Big Deal and NP Digital was incurred by Plaintiffs.

95.    Each of these transfers and obligations to Defendants Big Deal and NP Digital was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims.

96.    Multiple badges of fraud recognized by bankruptcy law, Del. Code Ann. tit. 6, § 1304(b), Nev. Rev. Stat. § 112.180(2), and Cal. Civ. Code § 3439.04(b), permeate the aforementioned transfers to Big Deal and NP Digital, as alleged above in paragraph 61.

97.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and applicable law, including Del. Code Ann. tit. 6, §

1304(a)(1), Nev. Rev. Stat. § 112.180(1)(a), and Cal. Civ. Code § 3439.04(a)(1), and Plaintiffs

may recover from Big Deal and NP Digital the full amount of such transfers, plus interest from the

relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs'

bankruptcy estates.

**COUNT IV**
**FRAUDULENT TRANSFERS PURSUANT TO**
**11 U.S.C. § 544(b) AND APPLICABLE LAW, INCLUDING**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305,  NEV. REV. STAT. § 112.180(1)(b),**
**AND CAL. CIV. CODE § 3439.04(a)(2)**
**(AGAINST DEFENDANTS BIG DEAL AND NP DIGITAL)**

98.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 97 as if fully

set forth herein.

99.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer

of an interest in their property or any obligation incurred by them that is voidable under applicable

law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and

obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable laws,

including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301 *et seq.*,

Nev. Rev. Stat. § 112.140 *et seq.*, and Cal. Civ. Code § 3439 *et seq.*

100.    Plaintiffs made the transfers and incurred the obligations addressed herein between

October 28, 2021, and October 25, 2022, as more specifically described in **Exhibit A**.  Each of the

transfers to Defendants Big Deal and NP Digital was a transfer of property of the Plaintiffs, and

each obligation to Big Deal and NP Digital was incurred by Plaintiffs.

101.    As explained above, Plaintiffs did not receive reasonably equivalent value in

exchange for any of these transfers and obligations, and each of the Plaintiffs: (a) was insolvent

on the date that each transfer and obligation was made; (b) became insolvent as a result of these

transfers and obligations; (c) engaged or was about to engage in a business or a transaction for

31

which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (d) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

102.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers were made and obligations incurred.

103.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b), and applicable law, including Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, Nev. Rev. Stat. § 112.180(1)(b), and Cal. Civ. Code § 3439.04(a)(2), and Plaintiffs may recover from Big Deal and NP Digital the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

**COUNT V**
**PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST DEFENDANTS BIG DEAL AND NP DIGITAL)**

104.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 103 as if fully set forth herein.

105.    On January 10, 2022, Plaintiff FTX Trading transferred $14,800,000 to Big Deal pursuant to the Big Deal Agreement dated January 2, 2022, as described in **Exhibit B**.  This transfer was a transfer of property of FTX Trading.

106.    On October 25, 2022, Plaintiff FTX Trading transferred $6,000,000 to NP Digital as an Annual Management Fee pursuant to the Earned Media SOW dated October 19, 2021, as described in **Exhibit B**.  This transfer was a transfer of property of FTX Trading.

107.     On August 26, 2022, Plaintiff FTX Trading transferred $325,140.96 to NP Digital pursuant to the Paid Media SOW dated October 19, 2021, as described in **Exhibit B**.  This transfer was a transfer of property of FTX Trading.

108.     On various dates throughout 2022,[27] Plaintiffs Alameda and Cottonwood transferred $2,400,000 to NP Digital pursuant to the Serum Agreements dated January 12, 2022, as described in **Exhibit B**.  Each transfer was a transfer of property of Plaintiffs.

109.     On October 17, 2022, Plaintiff FTX US transferred $299,999.95 from an FTX.US account controlled by NP Digital which constituted transfers from FTX US, as described in **Exhibit B**.  These transfers were transfers of property of FTX US.

110.     These transfers were made to benefit Defendants Big Deal and NP Digital.

111.     With respect to these transfers, Big Deal and NP Digital were creditors of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternately, Big Deal and NP Digital received such transfer for the benefit of a creditor or creditors of Plaintiffs.

112.     These transfers were made on account of antecedent debts owed by Plaintiffs to Big Deal pursuant to the Big Deal Agreement and to NP Digital pursuant to the FTX Media Agreements and Serum Agreements.

113.     At the time each transfer was made, Defendant Patel was an "insider" as a person in control and/or a non-statutory insider of Plaintiffs under Section 547(b)(4)(B).  Patel was the sole owner of Big Deal and owned and indirectly controlled NP Digital at the time each transfer was made.

114.     Each of the transfers was made within one year of the Petition Date.

---

[27]     Plaintiff Alameda made payments on April 6, 2022; May 19, 2022; and August 8, 2022. Plaintiff Cottonwood made payments on August 9 2022; August 10, 2022; October 6, 2022; and October 7, 2022.

115.     As discussed above, each of the transfers was made while Plaintiffs were insolvent.

116.     Each of the transfers enabled Big Deal and NP Digital to receive more than they would have received if: (a) the Plaintiffs' Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy Code; (b) the transfers had not been made; and (c) the amounts paid to Big Deal and NP Digital on account of the debt was determined by the Bankruptcy Code.

117.     Big Deal and NP Digital have not returned any portion of the transfers made to them by Plaintiffs during the one-year Preference Period.

118.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence in the circumstances of the case, have taken into account known or reasonably knowable affirmative defenses, and believe that these transfers are avoidable.

119.     Accordingly, each of these transfers should be avoided as a preference pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Big Deal and NP Digital the full amount of the transfers, plus interest from the transfer date, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

**COUNT VI**
**PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST DEFENDANT NP DIGITAL)**

120.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 119 as if fully set forth herein.

121.     In the event the Court concludes that Defendant Patel is not an insider, Plaintiffs made the transfers and incurred the obligations within ninety 90 days of the Petition Date, as addressed herein and specifically described in **Exhibit C**.

122.    On October 6, 2022 and October 7, 2022, Plaintiff Cottonwood transferred $300,000 to NP Digital pursuant to the Serum Agreements dated January 12, 2022, as described in **Exhibit C**.  This transfer was a transfer of property of Cottonwood.

123.    On October 25, 2022, Plaintiffs transferred $6 million to NP Digital as an Annual Management Fee pursuant to the Earned Media SOW dated October 19, 2021, as described in **Exhibit C**.  This transfer was a transfer of property of FTX Trading.

124.    On August 26, 2022, Plaintiffs transferred $325,140.96 to NP Digital pursuant to the Paid Media SOW dated October 19, 2021, as described in **Exhibit C**.  This transfer was a transfer of property of FTX Trading.

125.    On October 17, 2022, Plaintiff FTX US transferred $299,999.95 from an FTX.US account controlled by NP Digital which constituted transfers from FTX US, as described in **Exhibit C**.  These transfers were transfers of property of FTX US.

126.    Each of these transfers was made to benefit NP Digital.

127.    With respect to these transfers, NP Digital was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternately, NP Digital received such transfers for the benefit of a creditor or creditors of Plaintiffs.

128.    These transfers were made on account of antecedent debts owed by Plaintiffs to NP Digital pursuant to the FTX Media Agreements and Serum Agreements.

129.    Each of the transfers was made within 90 days of the Petition Date.

130.    As explained above, each of the transfers was made while FTX Trading, Cottonwood, and FTX US were insolvent.

131.    Each of the transfers enabled NP Digital to receive more than it would have received if: (a) the Plaintiffs' Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy

Code; (b) the transfers had not been made; and (c) the amounts paid to NP Digital on account of the debt was determined by the Bankruptcy Code.

132.    NP Digital has not returned any portion of the transfers made to it by FTX Trading, Cottonwood, or FTX US during the Preference Period.

133.    Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence in the circumstances of the case, have taken into account known or reasonably knowable affirmative defenses, and believe that these transfers are avoidable.

134.    Accordingly, each of these transfers should be avoided as a preference pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from NP Digital the full amount of the transfer, plus interest from the transfer date, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

## COUNT VII
## EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c)
## (AGAINST DEFENDANT NP DIGITAL)

135.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 134 as if fully set forth herein.

136.    To date, NP Digital has filed two claims against the Debtors' Chapter 11 estates and has one scheduled claim.  These include claims for (a) $6 million of purported damages arising from this Court's Order authorizing the Debtors to reject the FTX Media Agreements and Cottonwood-NP Digital Agreement [Claim No. 72713, amending Claim No. 3428];[28] (b) an

---

[28]    On August 18, 2023, the Court entered an order granting the Debtors' Fourth Omnibus Motion for an order authorizing the Debtors to reject certain executory contracts, prescribing that counterparties had 30 days from the date of service of entry of the order to file a claim for damages arising from the Debtors' rejection of such contracts [D.I. 2211].  Notably, on August 31, 2023, weeks after the Court entered this Order, Patel purportedly sold his six bedroom Las Vegas home for $21.25 million after being listed on the market for only a few days.  According to public

unpaid pre-petition invoice of $150,000 issued under the Cottonwood-NP Digital Agreement and

for any potential damages from any rejection by the Debtors of the same [Claim No. 3393]; and

(c) a scheduled claim for $126,562.50 against Alameda concerning an invoice related to the IEF-

NP Digital Agreement [Schedule 5258514].

137.    The FTX Media Agreements and Serum Agreements were insider transactions,

without meaningful negotiations, that were anything but fair and entered into at arms' length.

Defendants NP Digital and Patel, engaged in a pattern of misconduct at the expense of the Debtors

and its estate and stakeholders, including creditors.   Therefore, NP Digital's claims should be

subordinated on this basis.

138.    At the time each transfer took place pursuant to these Agreements, NP Digital and

Patel exploited Patel's access to the Debtors as a non-statutory insider in the sense that he held a

"close relationship with the debtor to such an extent as to suggest transactions were not conducted

at arm's-length."

139.    On October 18, 2021, the FTX Group employed Patel to oversee its performance

marketing and overall strategy, significant sponsorship deals, advertising budgets, and marketing

team.

140.    Just four days after Patel accepted his position, Patel, Bankman-Fried, and an FTX

in-house lawyer caused the FTX Group to enter into the FTX Media Agreements with NP Digital,

a company owned and controlled by Patel.   These Agreements committed the FTX Group to pay

---

sources, Patel had purchased the home in February 2021 for $4.5 million, Patel had purchased the
home in February 2021 for $4.5 million, and considered this sale as one of the highest prices per
square foot ever paid in Las Vegas for a single-family home not sold by a developer.
*See* https://www.reviewjournal.com/homes/real-estate-millions/mark-wahlberg-jim-murren-
homes-sales-top-las-vegas-luxury-list-2917080/.

exorbitant fees for services that were often duplicative, substandard, or not provided at all, thereby enriching NP Digital and Patel at the FTX Group's expense.

141.    In January 2022, just three months after the FTX Media Agreements were executed, Patel arranged for the FTX Group to enter into the Serum Agreements.  Under these Agreements, NP Digital was once again contracted to provide the same SEO and other marketing services for above market fees.

142.    NP Digital continued to rely on Patel's insider position within the FTX Group and his significant control to ensure that NP Digital received its unjustifiable fees.  For example, Patel discreetly arranged for NP Digital's fees to be paid through private Slack messages with FTX Trading's former CFO on multiple occasions, including a $6 million invoice mere weeks before the FTX Group's collapse.  This arrangement continued even after it became clear that NP Digital had failed to fulfill its contractual obligations and the engagements were terminated, or effectively terminated.

143.    Additionally, the FTX Media Agreements and Serum Agreements were neither negotiated in good faith or at arm's length.  Patel and NP Digital set the terms without any meaningful negotiations with the FTX Group.  This is evident from the arbitrary "set-up fee" and annual management fees, which were exorbitant and above-market, and provisions for termination damages amounting to the entire contract value.

144.    NP Digital's conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed the creditors and stakeholders in the Chapter 11 Cases and conferred an unfair advantage on NP Digital.

145.    NP Digital employees deliberately concealed or altered the terms of the FTX Media Agreements from FTX Group employees to hide the exorbitant and above-market fees.

Furthermore, NP Digital was aware that it failed to provide the Debtors with most of the contracted-for services, and any services rendered were subpar and unsatisfactory. Despite providing little to no value to the FTX Group, NP Digital received tens of millions of dollars in fees and $6 million just weeks before the FTX Group's collapse.

146.    Nonetheless, NP Digital has filed proofs of claim in the Chapter 11 Cases for $6 million in rejection damages due to the "premature termination of the Earned Media SOW" and termination damages equal to the remaining contract value of the Cottonwood-NP Digital Agreement—yet another attempt to extract funds from the Debtors for nothing in return.

147.    Given the egregious nature of NP Digital's conduct and the clear advantage conferred upon them at the expense of the Plaintiffs, equitable subordination is not only appropriate but necessary to ensure fairness among the Debtors' creditors. NP Digital should not be permitted to benefit from its insider status and misconduct, particularly when its dealings with the FTX Group were marked by self-dealing and bad faith.

148.    Equitable subordination of NP Digital's claims is consistent with the provisions and purposes of the Bankruptcy Code. The Plaintiffs are entitled to an order and judgment under 11 U.S.C. § 510(c) equitably subordinating all claims filed by NP Digital.

149.    Under principles of equitable subordination, in equity and good conscience, any and all claims of NP Digital should be subordinated for purposes of distribution, pursuant to Section 510(c) of the Bankruptcy Code.

## COUNT VIII
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)
### (AGAINST ALL DEFENDANTS)

150.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 149 as if fully set forth herein.

151.    As alleged above, Plaintiffs are entitled to avoid the transfers addressed herein under Sections 544, 547, and 548 of the Bankruptcy Code.

152.    Because the Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from the Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Plaintiffs' bankruptcy estate.

**COUNT IX**
**DISALLOWANCE OF CLAIMS PURSUANT TO  11 U.S.C. § 502(d)**
**(AGAINST ALL DEFENDANTS)**

153.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 152 as if fully set forth herein.

154.    As alleged above, the Defendants are transferees of transfers avoidable under Section 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

155.    Defendant NP Digital has filed two claims against the Debtors' Chapter 11 estates and has one scheduled claim, as discussed above.

156.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, these claims and any claims of the Defendants that will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until the Defendants have relinquished to the Plaintiffs the property transferred, or have paid the Plaintiffs the value of such transferred property, for which and to the extent the Court has determined the Defendants are liable pursuant to 11 U.S.C § 550.

## COUNT X
## KNOWING ASSISTANCE IN BREACH OF FIDUCIARY
## DUTIES UNDER ANTIGUA AND BARBUDA LAW
## (AGAINST DEFENDANT PATEL)

157.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 156 as if fully set forth herein.

158.    At all relevant times, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing, and oversight—to FTX Trading under the law of Antigua and Barbuda.

159.    By causing FTX Trading to make the transfers to Big Deal, in exchange for which FTX Trading did not receive, and had virtually no prospect of receiving, reasonably equivalent value, Bankman-Fried breached his fiduciary duties to FTX Trading.

160.    Patel knew that the transactions with Big Deal did not provide, and had virtually no prospect of providing, FTX Trading with reasonably equivalent value.  Patel thus knowingly assisted in and/or failed to prevent Bankman-Fried's breaches of fiduciary duty to FTX Trading.

161.    As a result of Bankman-Fried's breaches of fiduciary duty in connection with the transfers made to Big Deal, and Patel's knowing assistance in those breaches, FTX Trading suffered damages in the amount of $14.8 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and grant the following relief:

(a)    Award Plaintiffs compensatory damages in an amount to be determined at trial;

(b)    Avoid the fraudulent transfers to or for the benefit of Defendants, and direct Defendants to return to Plaintiffs the transferred property and related expenses or the value thereof,

plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorneys' fees and costs;

(c)      Enter an order that the transfers addressed herein are avoidable fraudulent transfers and obligations, and/or preferences, under 11 U.S.C. §§ 547 and 548, and/or applicable non-bankruptcy law.

(d)      Enter an order under 11 U.S.C. § 510(c) subordinating for purposes of distribution any and all claims filed or held by Defendant NP Digital in these Chapter 11 Cases.

(e)      Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by the Defendants in these Chapter 11 Cases unless and until the Defendants have relinquished to the Plaintiffs the amount ordered as an award for avoidable transfers;

(f)      Award Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(g)      Award Plaintiffs' reasonable and necessary attorneys' fees and expenses, together with all costs of court, and investigation expenses; and

(h)      Grant Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: November 8, 2024
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Sascha N. Rand (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
sascharand@quinnemanuel.com

Anthony P. Alden (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-7000
anthonyalden@quinnemanuel.com

*Special Counsel to the Debtors*